BIC PEN CORPORATION, Petitioner,

v.

Janace M.CARTER, as Next Friend of Brittany Carter, Respondent.

No. 05–0835.

Supreme Court of Texas.

Argued Feb. 13, 2007.

Decided April 18, 2008.

Rehearing Denied May 30, 2008.

Reagan W. Simpson, King & Spalding LLP, Houston, Kyle H. Dreyer, Hartline Dacus Dreyer & Kern, L.L.P., Dallas, Darrell L. Barger, Hartline Dacus Barger Dreyer & Kern, L.L.P., Corpus Christi, Bert L. Huebner, Bay City TX, for Petitioner.

Lisa Powell, Daniel Keith Worthington, Daniel G. Gurwitz, Atlas & Hall L.L.P., McAllen, Daniel W. Shindler, Attorney at Law, Bay City, TX, for Respondent.

Brendan K. McBride, Prichard Hawkins McFarland & Young, L.L.P., Amy Eikel, King & Spalding LLP, Houston, O. Rey Rodriguez, Fulbright & Jaworski L.L.P., Dallas, TX, for Amicus Curiae.

Justice MEDINA delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice O'NEILL, Justice WAINWRIGHT, Justice BRISTER, Justice JOHNSON, and Justice WILLETT joined.

Six-year-old Brittany Carter was severely burned when her five-year-old brother,

Jonas, accidentally set fire to her dress with a J–26 model BIC lighter. Janace Carter, acting as Brittany's next friend, sued BIC Pen Corporation claiming Brittany's injuries resulted from manufacturing and design defects in the J–26 lighter. The jury found for Carter, awarding three million dollars in actual damages and two million dollars in exemplary damages.[1] The court of appeals affirmed the trial court's judgment as to the design defect claim, but did not address the manufacturing defect claim. 171 S.W.3d 657, 662.

BIC brings six issues on appeal: (1) whether Carter presented legally sufficient evidence of causation; (2) whether federal law preempts Carter's claims; (3) whether Carter proved either a design or manufacturing defect; (4) whether BIC acted with malice; (5) whether the trial court erred in giving a spoliation instruction; and (6) whether the trial court's judgment awarded excessive interest. Because we conclude that federal law preempts the design defect claim, we reverse the court of appeals' judgment and remand to the court for it to consider the remaining issues.

## I

The J–26 lighter is subject to the federal standards for child-proof lighters and must be certified as compliant by the Consumer Product Safety Commission ("the Commission"). 15 U.S.C. § 2053(a) (2008). The Commission is an independent regulatory commission created under the Consumer Product Safety Act ("CPSA") of 1972 and charged with "protect[ing] the public against unreasonable risks of injury associated with consumer products," "develop[ing] uniform safety standards for consumer products," and "promot[ing] research and investigation into the causes and prevention of product-related . . . injuries." *Id.* § 2051(b)(1), (b)(2), (b)(4).

After evaluating data showing that disposable lighters posed a significant risk of harm to the public, the Commission adopted regulations requiring disposable lighters to be child-resistant and setting a protocol for testing a lighter's child resistance. *See* 16 C.F.R. § 1210.4. The regulations set forth specific requirements for compliance. *Id.* §§ 1210.3, 1210.4. The first requirement for lighters is that they must "be resistant to successful operation by at least [eighty-five] percent of the child-test panel when tested in the manner prescribed by § 1210.4." *Id.* § 1210.3(a). Other requirements are that each lighter must: (1) "[r]eset itself automatically after each operation of the ignition mechanism," (2) "[n]ot impair safe operation of the lighter when used in a normal and convenient manner," (3) "[b]e effective for the reasonably expected life of the lighter," and (4) "[n]ot be easily overriden or deactivated." *Id.* § 1210.3(b)(1)-(4).

The regulations then set out the testing protocol. *Id.* § 1210.4. A lighter passes the Commission's test for child resistance if no more than fifteen percent of children tested under the protocol can operate the lighter. *Id.* § 1210.3(a). Each test panel consists of one hundred children divided into six groups of fifteen to seventeen children, with each group using one of six "surrogate lighters." *Id.* § 1210.4(c)(1), (c)(2). A surrogate lighter looks like an actual lighter, but emits a signal when operated rather than producing a flame. *Id.* § 1210.2(f). If at least ninety percent of the one-hundred-child test panel cannot operate a surrogate lighter after two five-minute attempts, the lighter passes. *See id.* § 1210.4(h)(1). If the lighter does not pass, testing is conducted with another one

---

1. The exemplary damages were reduced to $750,000 as required by section 41.008 of the Texas Civil Practice and Remedies Code.

hundred randomly selected children. *Id.* The lighter passes if it cannot be operated by at least eighty-five percent of the two hundred children. *Id.* § 1210.4(h)(2). The Commission's test protocol is performance based, meaning the Commission does not set specific standards for each lighter, but rather charges manufacturers with designing lighters that meet the child-resistance standards. *See* Safety Standard for Cigarette Lighters, 58 Fed.Reg. 37,580–81 (July 12, 1993) (codified at 16 C.F.R. pt. 1210).

Before receiving a certificate of compliance from the Commission, manufacturers must provide the Commission with a complete description of the child-resistant features of the lighter and all related dimensions and force requirements. 16 C.F.R. § 1210.15(b)(1), (b)(2). BIC has adopted five design characteristics that collectively establish child resistance in a disposable lighter: (1) the distance that the shield (or guard) at the top of the lighter must move; (2) the force needed to depress the shield; (3) the distance that the fork mechanism must move to release butane; (4) the force needed to depress the fork, or "fork force"; and (5) the force needed to produce a spark by rotating the sparkwheel, or "sparkwheel rotation force."

The J–26 lighter underwent qualification testing in 1994,[2] with six surrogates representing the range of forces intended for use in the J–26. *See id.* § 1210.4(c)(1). Ninety percent of the children tested could not operate the surrogates. Only three of the surrogates could be operated by any child: three out of seventeen children operated Surrogate Two, one out of seventeen children operated Surrogate Four, and six out of sixteen children operated Surrogate Five. The Commission issued a certificate of compliance because only ten of the one hundred children were able to operate the entire group of surrogates; thus, the average of the surrogates as a whole was ninety percent child resistant.

## II

The United States Constitution provides that the laws of the United States are "the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Thus, when a state law conflicts with federal law, it is preempted and has no effect. *Maryland v. Louisiana,* 451 U.S. 725, 747, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981); *Mills v. Warner Lambert Co.,* 157 S.W.3d 424, 426 (Tex.2005). State laws may conflict with federal laws and be preempted in three ways. *See Great Dane Trailers, Inc. v. Estate of Wells,* 52 S.W.3d 737, 743 (Tex. 2001). First, "[a] federal law may expressly preempt state law." *Id.* (citing *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)). Second, "federal law or regulations may impliedly preempt state law or regulations if the statute's scope indicates that Congress intended federal law or regulations to occupy the field exclusively." *Id.* (citing *Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995)). Finally, state law is impliedly preempted if it "actually conflicts with federal law or regulations," because "(1) it is impossible for a private party to comply with both state and federal requirements; or (2) state law obstructs accomplishing and executing Congress' full purposes and objectives." *Id.*

BIC argues that Carter's claims here are impliedly preempted because they

**2.** The J–26 was also tested in 1997. The lighter at issue here was manufactured in October 1997, and there was some dispute at trial as to which test applied. The court of appeals concluded that the 1994 specifications should apply, and the parties do not dispute that conclusion here. *See* 171 S.W.3d at 671.

would frustrate the federal objectives of the Commission's child-resistant lighter standards. Carter counters that conflict preemption does not apply because the CPSA's saving clause specifically retains common law actions.

In addition to this saving clause, the CPSA also includes a preemption clause. 15 U.S.C. §§ 2074–75. It provides:

Whenever a consumer product safety standard under this chapter is in effect and applies to a risk of injury associated with a consumer product, no State or political subdivision of a State shall have any authority either to establish or to continue in effect any provision of a safety standard or regulation which prescribes any requirements as to the performance, composition, contents, design, finish, construction, packaging, or labeling of such product which are designed to deal with the same risk of injury associated with such consumer product, unless such requirements are identical to the requirements of the Federal standard.

*Id.* § 2075(a). The saving clause then provides that "[c]ompliance with consumer product safety rules or other rules or orders under this chapter shall not relieve any person from liability at common law or under State statutory law to any other person." *Id.* § 2074(a).

The United States Supreme Court considered the interplay between saving clauses and express preemption provisions in *Geier v. American Honda Motor Co.,* 529 U.S. 861, 869–73, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). The National Traffic and Motor Vehicle Safety Act contained both an express preemption[3] provision and a saving[4] clause. *Id.* at 867–68, 120 S.Ct. 1913. The Court concluded that the saving clause did "not bar the ordinary working of conflict pre-emption principles," explaining that the mere presence of a saving clause would not permit state-law tort claims in actual conflict with federal regulations. *Id.* at 869, 120 S.Ct. 1913 (emphasis omitted). The saving clause, the Court said, only prevented a defendant from claiming that compliance with federal standards automatically exempted it from state law. *Id.* Thus, the Court concluded that while saving clauses generally preserve state-law tort claims, they do not supersede conflicts preemption; if the state-law claim conflicts with federal regulations, it is still preempted.[5] *Id.* at 872, 120 S.Ct. 1913.

3. National Traffic and Motor Vehicle Safety Act's express preemption provision provides:

Whenever a Federal motor vehicle safety standard established under this title is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment[,] any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. 15 U.S.C. § 1392(d) (1988), *repealed by* Pub.L. No. 103–272, § 7(b), 108 Stat. 1379 (1994).

4. National Traffic and Motor Vehicle Safety Act's saving clause provides that "[c]ompliance with any Federal motor vehicle safety standard issued under this title does not exempt any person from any liability under common law." 15 U.S.C. § 1397(k) (1988), *repealed by* Pub.L. No. 103–272, § 7(b), 108 Stat. 1379 (1994).

5. The United States Supreme Court has vacillated between express and implied conflicts preemption in recent cases. For example, in *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 517, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), the Court considered whether the Federal Cigarette Labeling and Advertising Act preempted state law damages actions. The Court reasoned that through express preemption provisions, Congress defines a statute's preemptive scope, which implies that matters beyond that scope are not preempted. *Id.* Later, the Court relaxed this position in

■ As in *Geier*, the saving clause here allows state-law tort claims, but does not permit claims that actually conflict with the federal regulations. Carter contends, however, that the federal regulations merely create a liability which the common law may supplement. Carter further maintains that the J–26 lighter was unreasonably dangerous under common law because more effective child-resistant lighters were available. Thus, the issue for preemption purposes is whether Carter's claim of a higher standard of child resistance at common law is compatible with federal regulation under the CPSA.

Two courts have considered this question with conflicting results. The Mississippi Supreme Court agreed with BIC, holding that implied preemption should apply. *Frith v. BIC Corp.*, 863 So.2d 960, 967 (Miss.2004) (en banc). The Mississippi court concluded that the plaintiff's common-law standard conflicted with the federal standard, noting the Commission's finding that a higher percentage of child resistance would discourage consumer acceptance of child-resistant lighters and di-

rectly conflict with the objectives of the regulation. *Id.* A federal district court in New York, on the other hand, rejected preemption, interpreting the CPSA to set only minimum standards for disposable lighters. *Colon ex rel. Molina v. BIC USA, Inc.*, 136 F.Supp.2d 196, 209 (S.D.N.Y.2000). The court reasoned that the Commission's goal of reducing injuries to children was best served by supplementing the federal minimum standard on a case-by-case basis, according to the stricter requirements, if any, imposed by state common law. *See id.* at 209 ("national minimum standard for the design, manufacture, and testing of disposable lighters, coupled with the added protection of state common law liability can only further protect the public, especially young children, against unreasonable risks of injury").

The Commission considered higher and lower standards before setting the child-resistance standard at eighty-five percent. *See* 16 C.F.R. § 1210.5(g)(4); Proposed Safety Standard for Cigarette Lighters, 57 Fed.Reg. 36,949; 36,959 (August 17, 1992)

---

*Freightliner Corp. v. Myrick*, 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995), which dealt with the express preemption provision in the National Traffic and Motor Vehicle Safety Act. *Id.* at 283, 115 S.Ct. 1483. After determining the express preemption provision did not apply, the Court explained that "[t]he fact that an express definition of the preemptive reach of a statute 'implies'—i.e., supports a reasonable inference—that Congress did not intend to pre-empt other matters does not mean that the express clause entirely forecloses any possibility of implied preemption." *Id.* at 288, 115 S.Ct. 1483. The Court then concluded that the common law claims did not conflict with federal law. *Id.* at 289, 115 S.Ct. 1483. Shortly thereafter, however, in *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), the Court returned to its position in *Cipollone*, stating that the preemptive language in the Medical Device Amendments "means that we need not go beyond that language to deter-

mine whether Congress intended the [Medical Device Amendments] to pre-empt at least some state law...." More recently, the Court returned to its position in *Freightliner* in *Geier v. American Honda Motor Co.*, 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), holding that certain tort claims were impliedly preempted. *Id.* at 864, 120 S.Ct. 1913. In its most recent writing on preemption, *Riegel v. Medtronic, Inc.*, 552 U.S. ——, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008), the Court considered an express preemption provision in the Medical Device Amendments, deciding the case on express preemption alone. *Id.* at 1003. The Court did not mention implied conflicts preemption, although one justice, writing separately, noted that her refusal to read the express preemption provision as an automatic bar to common law tort claims would not render the premarket approval process irrelevant to the suit because implied conflicts preemption could possibly apply. *Id.* at 1018 (Ginsburg, J., dissenting).

(codified at 16 C.F.R. pt. 1210); 58 Fed. Reg. 37,570; 37,578. In choosing this number, the Commission weighed several factors, including child resistance, overall safety, the realities of manufacturing, the variability and randomness of child testing, the product's utility, and the importance of consumer acceptance. *See* 16 C.F.R. § 1210.5(c). One of the Commission's primary objectives was to create a standard that encouraged the manufacture of child-resistant lighters and yet did not discourage adults from using them. *See id.* The Commission was concerned that if adults were unable or unwilling to use child-resistant lighters, they might switch to non-child-resistant lighters or matches, which could expose children to an even greater risk. *Id.* Thus, the Commission concluded that "[r]equiring lighters subject to the rule to meet a higher acceptance criterion may, on its face, appear to increase safety," but in effect would not. 58 Fed.Reg. 37,570; *see also* 57 Fed.Reg. 36,950.

The Commission, moreover, was aware that greater child resistance might be achieved but specifically rejected imposing standards above eighty-five percent, noting that a higher standard would reduce the utility and convenience of the product and increase costs disproportionate to the benefits. *See* 58 Fed.Reg. 37,589. The Commission specifically noted that "[a] higher ( [ninety] percent) acceptance criterion was also considered," but rejected because the "higher performance level [was] not commercially or technically feasible for many firms" and "would have substantial adverse effects on manufacturing and competition, and would increase costs disproportionate to benefits." *Id.* The so-called "ratcheting-up" effect also played a part in the Commission's decision. *See* 57 Fed.Reg. 36,950. This effect results from a manufacturer's need to exceed a standard because of: (1) "component and assembly quality control limits" (*i.e.,* manufacturing tolerances); and (2) "potential

variation in the results of testing." *Id.; accord id.* at 36,945; 36,946 (noting that manufacturers would need to make lighters that perform above the eighty-five percent level to minimize the possibility that the Commission would test a manufacturer's lighter and obtain results below the eighty-five percent level). The Commission thus concluded that an eighty-five percent standard would generally result in the production of surrogate lighters approaching ninety-percent effectiveness when tested. *See* 58 Fed.Reg. 37,570.

■ As already noted, one of the Commission's primary concerns was the selection of a standard that encouraged the manufacture of child-resistant lighters and their acceptance by adult users. *See* 16 C.F.R. § 1210.5(c). Interpreting federal regulation in this area as a liability floor that may be enhanced by state law, however, undercuts the federal regulations and the Commission's conclusion that the eighty-five percent test "strikes a reasonable balance between improved safety for a substantial majority of young children and other potential fire victims and the potential for adverse competitive effects and manufacturing disruption." 58 Fed. Reg. 37,589. The Commission specifically rejected more stringent standards, noting the problems that such standards would create by reducing the utility and convenience of the product and increasing costs disproportionate to benefits. *Id.* Because the Commission weighed these competing concerns when drafting its standard, we conclude that imposing a common law rule that would impose liability above the federal standard is contrary to the Commission's plan and conflicts with federal law.

We find additional support for our conclusion in the CPSA, which provides for the creation of state specific exemptions to the federal regulations:

Upon application of a State or political subdivision of a State, the Commission may by rule, after notice and opportunity for oral presentation of views, exempt from the provisions of subsection (a) of this section [preemption of all non-identical state standards] (under such conditions as it may impose in the rule) any proposed safety standard or regulation which is described in such application and which is designed to protect against a risk of injury associated with a consumer product subject to a consumer product safety standard under this chapter if the State or political subdivision standard or regulation—

(1) provides a significantly higher degree of protection from such risk of injury than the consumer product safety standard under this chapter, and

(2) does not unduly burden interstate commerce.

In determining the burden, if any, of a State or political subdivision standard or regulation on interstate commerce, the Commission shall consider and make appropriate (as determined by the Commission in its discretion) findings on the technological and economic feasibility of complying with such standard or regulation, the cost of complying with such standard or regulation, the geographic distribution of the consumer product to which the standard or regulation would apply, the probability of other States or political subdivisions applying for an exemption under this subsection for a similar standard or regulation, and the need for a national, uniform standard under this chapter for such consumer product.

15 U.S.C. § 2075(c). This provision indicates that Congress considered the need to balance a state's desire for a higher liability standard with the concomitant burden a non-uniform state standard might impose on interstate commerce. Congress vested the Commission with the authority to review applications for exemption against the factors set out in its regulation. This process would serve no purpose were the states free to raise the liability bar through application of their common law.

The Supreme Court's most recent case on preemption is in agreement. *Riegel v. Medtronic, Inc.*, 552 U.S. ——, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008). In *Riegel*, the issue was whether common law claims were preempted by the Medical Device Amendments ("MDA") once the medical device at issue had gone through a "rigorous" pre-market approval process. *Id.* at 1002, 1004. When considering the policy behind preempting common law claims, the Court reasoned:

State tort law that requires a manufacturer's catheters to be safer, but hence less effective, than the model the FDA has approved disrupts the federal scheme no less than state regulatory law to the same effect. Indeed, one would think that tort law, applied by juries under a negligence or strict-liability standard, is less deserving of preservation. A state statute, or a regulation adopted by a state agency, could at least be expected to apply cost-benefit analysis similar to that applied by the experts at the FDA ... A jury, on the other hand, sees only the cost of a more dangerous design, and is not concerned with its benefits....

*Id.* at 1008. The Court held that the plaintiff's claims regarding the design, labeling, and manufacture of an arterial catheter were preempted. *Id.* at 1005, 1011.

Although *Riegel* addressed an express preemption provision, its policy analysis is likewise applicable here. *See id.* at 1002. Both the MDA provisions in *Riegel* and the CPSA provisions at issue here require products to go through safety testing before being released on the market. In both cases, a careful analysis of the provi-

sions reveal that the testing is not merely a safety floor, but a balancing of factors that ensure the product meets carefully prescribed safety standards. Particularly here, where the Commission rejected the idea of more stringent standards, we agree that, under *Riegel*, a common-law tort claim could impose duties that conflict with the federal regulatory scheme and therefore would "stand as an obstacle to the accomplishment and execution of the full purpose and objections of Congress." *Lohr*, 518 U.S. at 496, 116 S.Ct. 2240 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). Thus, we conclude that Carter's design defect claim is impliedly preempted.

In summary, we disagree with the court of appeals that Carter's judgment below can be affirmed on the theory of design defect because the J–26 was properly certified according to the federal protocol and because imposing a higher standard under common law would conflict with the federal regulatory scheme in this area.

### III

■ BIC next argues that the manufacturing defect claim is also preempted because it is merely a restatement of the design defect claim. We disagree. "A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous." *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex.2006). Thus, whether a manufacturing defect exists is a question separate from whether the design itself was faulty.

■ In the court of appeals, BIC argued that the evidence of manufacturing defect was both legally and factually insufficient. 171 S.W.3d at 662. Having deter-

mined there to be evidence of defective design, the court did not reach the issue of manufacturing defect. Moreover, the focus of the briefing in this Court has understandably been on the design defect issue with little attention paid to this unaddressed issue. Because we lack jurisdiction to review the factual sufficiency of the evidence, we conclude that the manufacturing defect issue should be remanded to the court of appeals for its review. *See Campbell v. State*, 85 S.W.3d 176, 184 (Tex.2002).

### IV

■ BIC next challenges the jury finding of malice, the predicate for the award of exemplary damages in this case. The jury found that the J–26 was defectively designed and manufactured, and that BIC acted with malice in the production of this lighter. The court of appeals affirmed, holding that a reasonable trier of fact could have formed a firm conviction or belief that BIC acted with malice. 171 S.W.3d at 675.

When this case was filed, malice was defined under section 41.001(7)[6] of the Civil Practice and Remedies Code as:

(A) a specific intent by the defendant to cause substantial injury to the claimant; or

(B) an act or omission: (i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

6. Section 41.001(7) was amended in 2003 after this lawsuit was filed. Act of June 2, 2003, 78th Leg., R.S. ch. 204 § 23.02(d), 2003 Tex. Gen. Laws 847, 899. Citations in the text to section 41.001 refer to the prior version.

Act of April 20, 1995, 74th Leg., R.S. ch. 19 § 1, 1995 Tex. Gen. Laws 108, 109. At the time, this statute also provided that the claimant could recover exemplary damages, even if only nominal damages were awarded, but only if it established by clear and convincing evidence that the harm resulted from malice as defined in subpart A above, that is, by clear and convincing evidence of the defendant's specific intent to cause substantial injury to the claimant. TEX. CIV. PRAC. & REM.CODE § 41.004(b).

Because we disagree with the court of appeals that design defect is an appropriate basis for affirming the damages award and because exemplary damages in this case depend on the existence of something more than nominal damages, we must remand this issue as well. The court of appeals should consider it along with sufficiency of the evidence of manufacturing defect.

## V

Finally, BIC argues that the judgment awards excessive interest because the interest rates provided in House Bill 2415[7] should apply to this judgment signed on August 8, 2003. The court of appeals disagreed, holding that the new, lower interest rate provided in this legislation did not take effect until September 1, 2003, three weeks after rendition of the judgment in this case. 171 S.W.3d at 678. BIC contends, however, that House Bill 2415 went into effect immediately upon signing by the Governor on June 20, 2003.

The Texas Constitution provides that once a bill becomes law by being passed by the Legislature and signed by the Governor, it generally does not take effect until ninety days after the adjournment of the session in which it was enacted. TEX. CONST. art. III, § 39; id. art. IV, § 15. However, a bill may take effect immediately upon signing by the Governor when passed by a recorded, two-thirds majority vote.[8] Id. art. III, § 39. The exception applies to bills and subsequent amendments. Caples v. Cole, 129 Tex. 370, 102 S.W.2d 173, 176 (1937). Thus, in Caples, we wrote:

> A harmless bill might be passed in its inception by the requisite vote, and then be radically amended and such amendments be put into immediate effect without the vote required by the Constitution. If such were the rule, the vote on the original bill would control as to whether it became a law immediately after its final passage, and not the final vote subsequently taken on the amendments placed thereon by the other branch of the Legislature, and the plain provision of the Constitution requiring that it be adopted by a vote of two-thirds of all the members of each house, in order to declare an emergency, could be evaded.

Id. Subsequent amendments and resolutions must accordingly meet the constitutional requirement of a recorded, two-

---

7. House Bill 4 contains almost identical language to House Bill 2415, regarding changes to the post-judgment interest provisions of Texas Finance Code section 304.003(c). Compare Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 6.01, 2003 Tex. Gen. Laws 847, 862 (House Bill 4) with Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 1, 2003 Tex. Gen. Laws 2096–97 (House Bill 2415). Because House Bill 4 became effective on September 1, 2003, it does not apply to this case. See

Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 6.01, 2003 Tex. Gen. Laws 847, 862.

8. "No law passed by the Legislature, except the general appropriation act, shall take effect or go into force until ninety days after the adjournment of the session at which it was enacted, unless the Legislature shall, by a vote of two-thirds of all the members elected to each House, otherwise direct; said vote to be taken by yeas and nays, and entered upon the journals." TEX. CONST. art. III, § 39.

thirds majority vote to go into effect before ninety days after adjournment. *See id.*

Here, the Legislature passed House Bill 2415 by a two-thirds majority vote of each house on June 1, 2003. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 1, 2003 Tex. Gen. Laws 2096, 2097. The vote was taken by a recorded vote. *See id.* The next day, the Legislature adopted Senate Resolution 66, which amended House Bill 2415 by changing its cap on the post-judgment interest rate from the yield on United States Treasury Bills to the prime rate as published by the Federal Reserve Bank of New York. *See id.* While the resolution was adopted without objection, the vote was not recorded, and thus under the Constitution did not qualify for expedited effect but rather took effect on September 1, 2003. *Id.* Accordingly, we agree with the court of appeals that this interest rate did not apply to the judgment in this case.

\* \* \* \*

Because we conclude that Carter's design defect claim is preempted by federal law and therefore cannot serve as the basis for affirming the judgment below, we reverse the court of appeals' judgment and remand the cause to that court to review the issues that remain.

Justice GREEN did not participate in the decision.