Affirmed in Part and Reversed and Remanded in Part and Opinion filed
April 14, 2009








 

Affirmed in Part and Reversed and Remanded in Part and Opinion
filed April 14, 2009.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00445-CV

____________

 

SUSAN BROCKERT, Appellant

 

V.

 

WYETH PHARMACEUTICALS, INC., KAY
LAMBERTH, LANA PAVLESIC, JAMES TY, ANN CALLAN, AND PATRICK TYRRELL, Appellees

 



 

On Appeal from the 151st
District Court

Harris County, Texas

Trial Court Cause No. 2003-49357

 



 

O P I N I O N








In this case, appellant Susan Brockert raises two issues:
(1) whether federal law preempts her failure-to-warn claims arising from her
use of a prescription drug containing estrogen combined with progestin in
hormone-replacement therapy; and (2) whether her design-defect claim that
estrogen alone is a superior form of hormone-replacement therapy compared to
estrogen with progestin is viable under Texas strict-liability and negligence
law.  For the reasons explained below, we hold that federal law does not
preempt Brockert=s failure-to-warn claims, but her
design-defect claim is not viable under Texas law.  We therefore reverse in
part, affirm in part, and remand.

Background

Susan Brockert and several other plaintiffs sued Wyeth
Pharmaceuticals, Inc., and its sales representatives including Kay Lamberth,
Lana Pavelsic, James Ty, Ann Callan, and Patrick Tyrrell (collectively, AWyeth@), along with
other defendants, alleging that they were injured by various prescription drugs
used in hormone-replacement therapy (AHRT@).  The plaintiffs= claims included
failure to warn, design defect, manufacturing defect, fraud, negligence,
negligent misrepresentation, breach of warranty, and deceptive trade practices.[1] 
Relevant here, Brockert contends that she experienced breast cancer as a result
of taking Prempro, an HRT drug manufactured, marketed, and sold by Wyeth. 

In the 1940s, well before the introduction of Prempro,
Wyeth manufactured a hormone-replacement drug known as Premarin.  Premarin was
an estrogen-only compound used to treat menopausal symptoms.  This treatment
was commonly known as estrogen-replacement therapy, or ERT.  However, after an
increase in endometrial cancer became associated with the use of estrogen
alone, scientists determined that the addition of another hormone,
progesterone, to ERT could reduce the risk of endometrial cancer.  








In 1992, Wyeth submitted a New Drug Application (ANDA@) to the Food and
Drug Administration (AFDA@) for Prempro. 
Prempro was a combination of estrogen and progestin, a synthetic progesterone,
to be used for treating menopausal symptoms and preventing osteoporosis, while
protecting against endometrial hyperplasia in women with an intact uterus.  As
part of the NDA, Wyeth submitted a proposed warning labeling for Prempro.  

During the FDA=s consideration of
the Prempro NDA, it evaluated scientific studies on the risk of breast cancer
with estrogen alone and with estrogen and progestin in combination.  As a
result of that analysis, the FDA recognized that some studies had shown an
increased risk of breast cancer with estrogen alone and that the combination of
estrogen and progesterone may exacerbate that risk.  The FDA viewed the effect
of concomitant use of estrogen and progesterone on breast-cancer incidence as an
important safety issue concerning this class of drugs, but recognized that A[b]ecause of the
long latency between exposure to promotional agents and detection of clinical
tumors . . . prospective studies take many years to conduct and require
extremely large sample sizes to ensure statistically meaningful treatment group
comparisons@ and therefore Amany more years
are still needed before the relationship between HRT and breast cancer can be
definitively determined.@

The FDA also evaluated Wyeth=s proposed
labeling for Prempro and considered how it wanted the final label to read.  The
wording of the label evolved as Wyeth and the FDA communicated concerning the
FDA=s proposed
revisions.  Among other things, the FDA instructed Wyeth to revise portions of
its warnings concerning the risk of breast cancer, and required language
warning of the possible increased risk of breast cancer from the use of
estrogen with progestin and warning that the risk may be higher than that
associated with the use of estrogen alone.  The FDA=s recommendation
for approval of Prempro was specifically conditioned on Wyeth using the FDA=s specified
language for the Prempro labeling, including its modifications to the
breast-cancer warnings.  Wyeth complied with the FDA=s specifications,
and in 1995, the FDA approved Prempro.

Brockert used Prempro from 1997 until 2001, when she was
diagnosed with breast cancer.  At all times Brockert used Prempro, it was
accompanied by the FDA-approved warning label.








In 2002, the Women=s Health
Initiative (AWHI@), sponsored by the National Institutes of
Health, released certain findings of a large clinical trial studying the use of
Prempro to assess its risks and benefits in preventing heart disease and other
conditions.  The study was stopped early because the evidence of the risk of
breast cancer and cardiovascular events outweighed the evidence of its
benefits.  Wyeth then changed the Prempro warning label to include the WHI
findings and to strengthen the warnings addressing the risk of breast cancer,
cardiovascular effects, and other conditions.  The FDA approved the revised
warning labels.  According to Wyeth, Prempro remains on the market, and the
exact dosage Brockert was prescribed is still available and prescribed today.

Brockert alleges that, had Wyeth properly tested Prempro as
the WHI did, it would have refrained from introducing the drug to the market or
would have adopted the post-WHI label accepted by the FDA far earlier.  Under
either scenario, she contends that more likely than not she would have remained
cancer-free.

Wyeth filed two motions for summary judgment.  The first
motion addressed Brockert=s failure-to-warn claims.  The second
addressed all other claims.  The trial court granted the first motion for summary
judgment on federal preemption grounds, and did not specify the grounds for
granting the second motion for summary judgment.  On appeal, Brockert has
abandoned all her claims except her failure-to-warn and design-defect claims.

Analysis








Brockert first challenges the trial court=s grant of both
Wyeth=s first and second
summary judgments.  Brockert frames her first issue as A[w]hether a claim
that a drug manufacturer should have studied a product more thoroughly and
issued stronger warnings earlier is preempted by FDA regulations when the very
warnings Plaintiff advocates are warnings the FDA approved when a third party
finally performed the study the defendant should have undertaken, meaning there
is no conflict between the tort claim and the FDA action.@  Brockert
describes her second issue as A[w]hether a claim that estrogen combined
with progestin is unreasonably dangerous and defective because it is more
harmful than estrogen alone can serve as the basis for a design defect claim
under Texas law.@  Both of Wyeth=s summary-judgment
motions were hybrid traditional and no-evidence motions.  See Tex. R.
Civ. P. 166a(c), (i).  We therefore apply the established standards of review
appropriate for each.  See Joe v. Two Thirty Nine Joint Venture, 145
S.W.3d 150, 156B57 (Tex. 2004); Ford Motor Co. v
Ridgway, 135 S.W.3d 598, 600B601 (Tex. 2004).

I.        Brockert=s Failure-to-Warn
Claims

Brockert contends that her claims are not preempted because
the warnings she advocates are precisely the warnings the FDA approved after
the WHI performed the study Wyeth failed to do, and therefore no conflict
exists between her claims and the FDA regulations.  Brockert also dismisses the
FDA=s own position,
recently advanced in a preamble to a 2006 revision of the FDA=s labeling rules,
that federal law preempts state-law claims conflicting with or contrary to
FDA-approved labeling.  Courts in some jurisdictions have deferred to the FDA=s position as
stated in the preamble to hold that state-law failure-to-warn claims are
preempted, while other courts have rejected the preamble as a basis for
preempting state-law claims.  Brockert contends the preamble either does not
apply or, if it does apply, it is entitled to no deference from the court.

As discussed in greater detail below, while this appeal was
pending, the United States Supreme Court issued Wyeth v. Levine, 129 S.
Ct. 1187 ( 2009), in which the Court held that federal law did not preempt a
plaintiff=s claims that the FDA-approved warning label on the
drug Phenergan, also made by Wyeth, inadequately warned of the drug=s risks.  Because
of the Wyeth v. Levine decision, Wyeth has informed this court that it
is Awithdrawing@ the preemption
argument advanced in its brief.  We therefore address Brockert=s issue without
reference to Wyeth=s appellate argument.

 

 








A.         Preemption

Federal preemption of state law is derived from the
Supremacy Clause of the United States Constitution:  AThis Constitution,
and the Laws of the United States . . . shall be the supreme Law of the Land;
and the Judges in every State shall be bound thereby, any Thing in the
Constitution or Laws of any State to the Contrary notwithstanding.@  U.S. Const.,
art. VI, cl. 2.  Thus, when a state law conflicts with federal law, it is
preempted and has no effect.  Maryland v. Louisiana, 451 U.S. 725, 746
(1981); BIC Pen Corp. v. Carter, 251 S.W.3d 500, 504 (Tex. 2008).  In
fields the states have traditionally occupied, such as health and safety
regulation, there is a strong presumption against federal preemption.  See
Hillsborough County, Fla. v. Automated Med. Labs. Inc., 471 U.S. 707,
715 (1985).  To overcome the general presumption that Congress did not intend
to preempt state law, Congress=s intent to preempt must be Aclear and
manifest.@  See id. at 715B16; Graber v.
Fuqua, ___ S.W.3d ___, No. 05-0303, 2009 WL 51570, at *3 (Tex. Jan. 9,
2009). 

State laws may conflict with federal laws and be preempted
in three ways:  (1) the federal law may expressly preempt state law; (2)
federal laws or regulations may impliedly preempt state law or regulations if
the statute=s scope indicates that Congress intended federal law
or regulations to occupy the field exclusively; or (3) state law is impliedly
preempted if it actually conflicts with federal law or regulations because it
is either impossible for a private party to comply with both state and federal
requirements or the state law obstructs accomplishing and executing Congress=s full purposes
and objectives.  See Graber, ___ S.W.3d at ___, 2009 WL 51570, at *2
(citing Crosby v. Nat=l Foreign Trade
Council, 530 U.S. 363, 372 (2000)); BIC Pen Corp., 251 S.W.3d at 504. 
Here, we are concerned with only the third basis for preemptionCan actual conflict
with federal law or regulations. 








Congress delegated to the FDA the authority to promulgate
regulations to enforce the Food, Drug & Cosmetic Act (AFDCA@).  See 21
U.S.C. ' 371(a); see
also Medtronic, Inc. v. Lohr, 518 U.S. 470, 496 (1996) (AFDA is the federal
agency to which Congress has delegated its authority to implement the
provisions of the [FDCA].@).  The FDA has exercised its delegated
authority to promulgate comprehensive prescription-drug-labeling regulations.  See
21 C.F.R. 201.56B.57 (2006). 

A drug manufacturer like Wyeth must submit a New Drug
Application to the FDA and that NDA must be approved before a new drug can be
marketed.  21 U.S.C. ' 355(a).  If the FDA finds that, among
other requirements, there is Asubstantial evidence@ that the drug is Asafe for use under
the conditions prescribed, recommended or suggested in the proposed labeling,@ and that Athe drug will have
the effect it purports or is represented to have under the conditions of use
prescribed, recommended, or suggested in the  . . . proposed labeling,@ then the FDA will
grant the NDA.  21 U.S.C. ' 355(d).  

In the NDA, a manufacturer like Wyeth is also required to
provide proposed labeling for the FDA=s consideration. 
21 U.S.C. ' 355(b)(1)(F).  The FDA must determine that the label
is not Afalse or
misleading in any particular.@  21 U.S.C. ' 355(d).  After a
drug is approved, a manufacturer generally cannot change the labeling unless it
first submits a supplemental application to the FDA and obtains approval for
the revision.  21 C.F.R. 314.70(b)(2)(v)(A)(2008).  In some instances, the FDA
permits changes to be made by submitting a supplement to the labeling, which
the manufacturer may implement before the FDA approves it.  Id. at
314.70(c).  Such changes include changes in the labeling to reflect newly
acquired information to add or strengthen a contraindication, warning,
precaution, or adverse reaction.  Id. at 314.70(c)(6)(iii)(A).  If a
manufacturer makes a change before receiving FDA approval, the agency may later
reject the change and order the manufacturer to cease distribution of the
product.  Id. at 314.70(c)(7).








In its 2006 preamble to its revised regulations, the FDA
explicitly stated its intent to preempt certain state-law failure-to-warn
claims as conflicting with federal regulatory objectives.  See
Requirements on Content and Format of Labeling for Human Prescription Drug and
Biological Products, 71 Fed. Reg. 3922, 3934 (Jan. 24, 2006).  In the preamble,
the FDA states that it Abelieves that State laws conflict with and
stand as an obstacle to achievement of the full objectives and purposes of
Federal law when they purport to compel a firm to include in labeling or
advertising a statement that FDA has considered and found scientifically
unsubstantiated.@  Id. at 3935.  The FDA also
expresses its disagreement with those cases viewing FDA-labeling requirements
as a minimum standard that may be supplemented by state law:  AFDA interprets the
act to establish both a >floor= and a >ceiling,= such that
additional disclosures of risk information can expose a manufacturer to
liability under the act if the additional statement is unsubstantiated or
otherwise false or misleading.@  Id. at 3934B35.[2] 


Since the FDA published the preamble, federal courts that
have considered its effect have reached differing conclusions.  For example, a
number of courts have deferred to the FDA=s interpretation
of its own labeling regulations as having some preemptive effect and dismissed
state-law failure-to-warn claims.  See, e.g., Sykes v. Glaxo-Smithkline,
484 F. Supp. 2d 289, 317 (E.D. Pa. 2007); Colacicco v. Apotex, Inc., 432
F. Supp. 2d 514, 530, 537 (E.D. Pa. 2006), aff=d, 521 F.3d 253 (3d
Cir. 2008), vacated, ___ S. Ct. ___, 2009 WL 578682 (Mar. 9, 2009); Dobbs
v. Wyeth Pharmaceuticals, 530 F. Supp. 2d 1275, 1288 (W.D. Okla. 2005); In
re Bextra and Celebrex Mktg. & Sales Practices and Prod. Liab. Litig.,
No. M: 05-1699 CRB, 2006 WL 2374742, at *8B9 (N.D. Cal. Aug.
16, 2006).  Others have refused to defer to the FDA and concluded that its
labeling regulations have no preemptive effect.  See, e.g., In
re Vioxx Prods. Liab. Litig., 501 F. Supp. 2d 776, 788 (E.D. La. 2007); In
re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 273B74 (E.D.N.Y 2007);
Perry v. Novartis Pharm. Corp., 456 F. Supp. 2d 678, 683B84 (E.D. Pa.
2006); Jackson v. Pfizer, Inc., 432 F. Supp. 2d 964, 968 (D. Neb. 2006).[3]








But the United States Supreme Court has recently resolved
the differing opinions about the deference to be accorded the preamble.  See
Wyeth v. Levine, 129 S. Ct. 1187 (2009).  This case also informs our
resolution of Brockert=s issue.  In Wyeth v. Levine, Diana
Levine lost her arm to gangrene after Phenergan, an anti-nausea drug, was
injected intravenously using a procedure known as an AIV push.@  Id. at
1191.  Levine alleged that Phenergan=s labeling was
defective because, even though it included warnings about the risks of
intravenous administration, it should have instructed clinicians not to use the
IV-push method, as other, safer options were available.  See id. at 1191B92.  A jury found
that Phenergan was a defective product because its warnings and instructions
were inadequate.  Wyeth appealed, arguing that FDA regulations directly
preempted Levine=s claims.  Id. at 1193.  The
Vermont Supreme Court affirmed the judgment below, holding that the jury=s verdict did not
conflict with the FDA=s labeling requirements because Wyeth
could have warned against IV-push administration without prior FDA approval,
and because federal-labeling requirements Acreate a floor,
not a ceiling@ for state regulation.  Id.  The United States
Supreme Court granted Wyeth=s petition for certiorari to consider
whether the FDA=s labeling requirements provide Wyeth with
a complete defense to Levine=s tort claims.  Id. at 1191.

Before the Supreme Court, Wyeth argued that Levine=s claims are
preempted because it would have been impossible for it to comply with a
state-law duty to modify its labeling without violating federal law.  Id.
at 1193B94.  Wyeth further
argued that recognition of Levine=s state-law tort
action creates a unacceptable obstacle to the accomplishment and execution of
the full purposes and objectives of Congress because it substitutes a lay jury=s decision about
drug labeling for the expert judgment of the FDA.  Id. at 1194.  In
advancing the latter argument, Wyeth relied on the FDA=s declaration in
the 2006 preamble that state-law failure-to-warn claims are preempted.  Id.
at 1200. 








In support of its first argument, Wyeth contended that it
would be impossible for it to comply with both state-law and federal-labeling
duties because it could only have changed Phenergan=s label in
response to new information that the FDA had not previously considered.  See
id. at 1196.  However, the Court rejected this argument, noting that the
FDA itself had explained that newly acquired information is not limited to new
data, but also encompasses A>new analyses of
previously submitted data.=@  Id. at
1197 (citing 73 Fed. Reg. 49609, 49604).  The Court explained that A[t]he rule
accounts for the fact that risk information accumulates over time and that the
same data may take on a different meaning in light of subsequent developments.@  Id.  Thus,
the Court concluded, as Wyeth became aware of information about amputations
resulting from Phenergan injections, it Acould have
analyzed the accumulating data and added a stronger warning about IV-push
administration of the drug.@  Id.  Further, the Court rejected
Wyeth=s claim that
unilaterally changing the warning could have subjected it to liability for
misbranding and unauthorized distribution under the FDA regulations, noting
that Ait has remained a
central premise of federal drug regulation that the manufacturer bears
responsibility for the content of its label at all times.@  Id. at
1197B98.  Absent clear
evidence that the FDA would not have approved a change to Phenergan=s label, the Court
refused to conclude that it was impossible for Wyeth to comply with both
federal and state requirements.  Id. at 1198B99.  Cautioning
that A[i]mpossibility
pre-emption is a demanding defense,@ the Court held
that Athe mere fact that
the FDA approved Phenergan=s label does not establish that it would
have prohibited such a change.@  Id. at 1199.

The Supreme Court also rejected Wyeth=s second argument
that requiring it to comply with a state-law duty to provide a stronger warning
would obstruct the purposes and objects of federal drug-labeling regulation,
concluding instead that Aall evidence of Congress=s purposes@ was contrary to
this argument.  Id. at 1199.  The Court noted that, although Congress
provided an express-preemption provision for medical devices, it did not enact
a similar provision for prescription drugs, and it considered this Apowerful evidence@ that ACongress did not
intend FDA oversight to be the exclusive means of ensuring drug safety and
effectiveness.@  Id. at 1200. 








Further, the Court dismissed Wyeth=s argument that
the 2006 preamble requires that courts defer to the FDA=s judgment in Aperform[ing] a
precise balancing of risks and benefits@ and Aestablish[ing] a
specific labeling standard that leave no room for different state-law
judgments.@  See id. at 1200.  The Court explained that
the preamble was not an agency regulation with the force of law such that it
could preempt conflicting state law, but was only a Amere assertion@ of the FDA=s position;
therefore, A[t]he weight we accord the agency=s explanation of
state law=s impact on the federal scheme depends on its
thoroughness, consistency, and persuasiveness.@  Id. at
1201 (citing United States v. Mead Corp., 533 U.S. 218, 234B35 (2001); Skidmore
v. Swift & Co., 323 U.S. 134, 140 (1944)).  Applying this standard, the
Court concluded that the 2006 preamble Adoes not merit
deference@ because when the FDA first proposed the new rule in
December 2000, it represented that the rule would not contain policies
implicating federalism or preempting state law; yet, in 2006 when the rule was
finalized, without notice or opportunity for comment, the preamble Aarticulated a
sweeping position on the FDCA=s pre-emptive effect.@  Id.  The
Court determined that this procedural failure rendered the agency=s views Ainherently
suspect.@  Id. 
Further, the Court determined that the preamble Ais at odds with
what evidence we have of Congress= purposes, and it
reversed the FDA=s own longstanding position without
providing a reasoned explanation.@  Id.  The
Court ultimately concluded that ACongress has
repeatedly declined to pre-empt state law, and the FDA=s recently adopted
position that state tort suits interfere with its statutory mandate is entitled
to no weight.@  Id. at 1204.  Accordingly, the Court affirmed
the Vermont Supreme Court=s judgment.  Id.

B.         Brockert=s Failure-To-Warn Claims Are Not
Preempted








Against this backdrop, we turn to our analysis of Brockert=s issue,
recognizing that the parties did not have the benefit of the Supreme Court=s decision in Wyeth
v. Levine when they made their arguments.  Brockert argues that no conflict
exists with FDA regulations, because the warnings she advocates are the very
warnings the FDA actually approved.  Further, Brockert distinguishes this case
from others in which preemption was found when the FDA considered and rejected
stronger warnings, because the warnings she advocates were based on newly
discovered evidence.

In light of Wyeth v. Levine, we must agree with
Brockert.  Below, Wyeth had argued that a direct conflict existed because it
would have been impossible for it to comply with both the FDA=s labeling requirements
and the stronger warnings Brockert advocates.  In the absence of evidence that
the FDA would not have approved a change to the labeling at issue, the Wyeth
Court rejected this Aimpossibility@ argument.  See
id. at 1198B99.  The Court instructed that the mere
fact that the FDA approved a prescription drug=s label does not
establish that it would have prohibited a change in response to new evidence of
a risk.  Id. at 1199.  The Wyeth Court also resoundingly rejected
the argument that the FDA=s 2006 preamble was entitled to deference,
instead concluding that the preamble was entitled to no deference whatsoever,
as it was Ainherently suspect.@  Id. at
1201, 1204.

Additionally, in reaching its conclusions, the Supreme
Court dismissed Wyeth=s argument that labeling changes were
permitted only to reflect Anewly acquired information@ the FDA had not
previously considered.  As the Court explained, the FDA=s own regulations
interpret Anewly acquired information@ to include new
analyses of previously submitted data.  See id. at 1196B97.  Here,
Brockert argues that Wyeth should have engaged in the type of testing
eventually done by the WHI that revealed the greater risk, and that Wyeth
should have adequately labeled Prempro to warn of this risk.  Further, Brockert
maintains that, if adequately warned, she would not have used Prempro and more
likely than not would not have acquired breast cancer.  Given the Wyeth
Court=s statement that a
Acentral premise@ of federal-drug
regulation is that Athe manufacturer bears responsibility for
the content of its label at all times,@ and the lack of
evidence that the FDA would have rejected a stronger warning concerning the
risk of breast cancer, we cannot affirm the trial court=s dismissal of
Brockert=s failure-to-warn
claim at the summary-judgment stage based on federal conflict preemption. 








We therefore sustain Brockert=s first issue.[4]

II.       Brockert=s Design-Defect
Claims

Wyeth=s second motion for summary judgment
addressed all claims other than the failure-to-warn claims.  On appeal,
Brockert challenges the trial court=s grant of this
summary-judgment motion only as to her design-defect claims.  

Relevant here, Wyeth alleged that it was entitled to
summary judgment on Brockert=s design-defect claims because (1) in
Texas, the Restatement (Second) of Torts, section 402A, comment k, applies to
exempt FDA-approved prescription drugs from strict-liability claims for design
defect; and (2) Brockert has no evidence of a safer alternative design. 
Because we hold that the trial court correctly granted summary judgment on the
second basis, we do not address the first.  








A design defect renders a product unreasonably dangerous as
designed, taking into consideration the utility of the product and the risk
involved in its use.  Gen. Motors Corp. v. Sanchez, 997 S.W.2d 584, 588
(Tex. 1999).  A plaintiff must prove that there is a safer alternative design
to recover under a design-defect theory.  Id.; Caterpillar, Inc. v.
Shears, 911 S.W.2d 379, 384 (Tex. 1995).  In the absence of a safer
alternative, a product is not unreasonably dangerous as a matter of law.  Caterpillar,
911 S.W.2d at 384.  

Brockert argues that she has presented substantial evidence
of a safer alternative design.  Specifically, she contends that the safer
alternative design to estrogen in combination with progestin is estrogen alone. 
As Brockert acknowledges, this alleged alternative design already exists in
prescription drugs like Premarin, also made by Wyeth.  According to Brockert,
estrogen with progestin is defective because the overall risk of breast cancer
to users outweighs the overall risk of estrogen alone to the endometrium. 
Wyeth responds that Premarin (estrogen only) is not an alternative design for
Prempro (estrogen with progestin), but instead is a completely different
prescription drug intended for a different population of women.  

As evidence of a safer alternative design, Brockert
presented the testimony of Dr. Daniel Lehane, a medical oncologist whose
practice emphasizes the treatment of breast cancer.  Dr. Lehane testified that
estrogen alone is a safer product than estrogen with progestin, and that the
addition of progestin to estrogen makes hormone therapy unreasonably dangerous
by substantially increasing the risk of breast cancer.  He also opined that it
is more likely than not that Brockert would not have acquired breast cancer had
she used estrogen alone and ceased all hormone therapy use shortly after the
WHI results were announced.  Further, Dr. Lehane opined that the benefits
attributed to hormone therapy are achieved by estrogen alone, and not the
progestin, explaining that progestin was added to reduce the incidence of
endometrial hyperplasia.  Dr. Lehane also testified that the increased risk of
breast cancer combination-hormone therapy generates outweighs the reduction in
the risk of endometrial cancer associated with estrogen alone.  








The Texas Supreme Court has held that a plaintiff cannot
prove design defect by claiming that defendant should have sold an entirely
different product.  See Caterpillar, 911 S.W.2d at 384B85.  In Caterpillar,
the allegedly defective product was a front-end loader with a
rollover-protective structure (AROPS@) that was
removable, which allowed the loader to be used in low-clearance areas.  The
plaintiff=s design-defect expert testified that the front-end
loader should have been configured so that the ROPS was not removable or so
that the removal of the ROPS would render the loader inoperable.  The supreme
court reversed a jury verdict of design defect, holding that this was Ano evidence . . .
of a safer alternative design for a front-end loader that could fulfill the
multi-purpose role of Caterpillar=s model 920 with a
removable ROPS.@  Id. at 384.  The court rejected
the plaintiff=s argument that the defendant should have changed the
product in such a way that it was essentially transformed into a different
product: 

A motorcycle could be made safer by
adding two additional wheels and a cab, but then it is no longer a motorcycle. 
A convertible can be made safer by fully enclosing the cab, but then it is just
an ordinary car.  The law of products liability demands that manufacturers and
distributors take feasible steps to make their products reasonably safe.  It is
not rational, however, to impose liability in such a way as to eliminate whole
categories of useful products from the market.   

Id. at 385; see
also Am. Tobacco Co., Inc. v. Grinnell, 951 S.W.2d 420, 433 & n.10
(Tex. 1997) (granting summary judgment to defendant because there was no safer
alternative design for cigarettes; A[c]ategorical
liability is not only an unworkable solution, but also a position repeatedly
rejected by courts.@).  

The Fifth Circuit has also found that a plaintiff cannot
prove that a safer alternative design exists by pointing to a substantially
different product, even when the other product has the same general purpose as
the allegedly defective product.  See Theriot v. Danek Med., Inc.,
168 F.3d 253 (5th Cir. 1999) (applying Louisiana law).  In Theriot, the
court held that a plaintiff who contended that pedicle screws were defectively
designed was required to demonstrate a safer alternative design that involved
pedicle screws, and that the plaintiff was not permitted to point to other
products intended to provide biomechanical stability, such as internal systems
using hooks or wires, or external neck braces.  Id. at 255. 








Thus, a safer alternative design must be one for the
product at issueChere, Prempro.  As Dr. Lehane points out
in his affidavit, in prescription drugs like Prempro, Asynthetic
progestin was added to estrogen to reduce the incidence of endometrial
hyperplasia.@  But Brockert does not explain how Prempro could have
been modified or improved; she instead argues that progestin should not have
been added to estrogen.  In essence, Brockert argues that the product Prempro
should have been a different product: its predecessor Premarin.  But, as the
supreme court has explained, Texas law does not recognize this sort of
categorical attack on a product.  See Caterpillar, 911 S.W.2d at 384B85.  

Finally, Wyeth contends that Brockert=s failure to raise
a fact issue concerning a safer alternative design disposes of all of her
design-defect claims, including her negligent-design-defect claim.  We agree.  See
Toshiba Intern. Corp. v. Henry, 152 S.W.3d 774, 784B85 & n.3 (Tex.
App.CTexarkana 2004, no
pet.) (AWhen a plaintiff
seeks recovery because of negligence or a theory of strict liability in tort,
the burden is on the plaintiff to prove that the injury resulted from a defect
in the product.@).

Therefore, we overrule Brockert=s second issue. 

Conclusion

We hold that Brockert=s failure-to-warn
claims, as alleged, are not preempted by federal-labeling regulations, and we
therefore sustain her first issue.  But we overrule Brockert=s second issue
because we hold that she failed to present any evidence of a safer alternative
design to support her design-defect claims.  We remand the case for further
proceedings consistent with this opinion.

 

 

/s/      Jeffrey V. Brown

Justice

 

 

Panel consists of
Chief Justice Hedges and Justices Guzman and Brown.









[1]  The other parties to the lawsuit are not involved in
this appeal.  During the course of the proceedings below, parties and claims
other than those involved in this appeal were dismissed or severed and Brockert
obtained an order from the trial court granting a final judgment so that this
appeal could proceed.  We note that, in the trial court=s order granting the two summary-judgment motions
appealed here, the order included as a defendant an entity identified as AWyeth,@ separate from
Wyeth Pharmaceuticals, Inc., but the appellees= brief does not specifically refer to this separate entity.  In her
pleadings, Brockert refers to Wyeth Pharmaceuticals, Inc., as a division of
Wyeth, Inc.





[2]  In the preamble, however, the FDA also recognized
that its regulation of drug labeling will not preempt all state-law actions,
such as state-law requirements that parallel FDA requirements.  71 Fed. Reg.
3936.





[3]  The parties cited these cases as illustrative of
their positions.  They are not intended to reflect an exhaustive review of the
case law on the subject.





[4]  Below, Wyeth argued the following alternative grounds for summary
judgment: (1) Brockert=s failure-to-warn claims are
precluded by the AMedicines@ provision of the Texas Tort Reform
Act of 2003, which provides a statutory rebuttable presumption that defendants
in failure-to-warn claims involving pharmaceutical products are not liable if
the warnings or information that accompanied the product was approved by the
FDA, and Brockert has no evidence to overcome the presumption; and (2) because
Brockert actually knew about the risk of breast cancer associated with Prempro,
Wyeth=s alleged failure to warn cannot be
a producing cause of her injury.  Post-Wyeth v. Levine, Wyeth urges us
to affirm summary judgment on Brockert=s failure-to-warn claims based on the Texas Tort Reform
Act.  But the trial court did not rule on the alternative grounds Wyeth raised.
Instead, the trial court expressly stated that it was granting summary judgment
on the federal-preemption ground and not addressing the others.  In the
interest of judicial economy, an appellate court may, but is not required to,
consider summary-judgment grounds the movant preserved for review and the trial
court did not rule on. Cincinnati Life Ins. Co. v. Cates, 927 S.W.2d
623, 627 (Tex. 1996); Nat=l Union Fire Ins. Co. of Pittsburgh, Pa., v. Ins.
Co. of N. Am., 955
S.W.2d 120, 126 n.4 (Tex. App.CHouston [14th Dist.] 1997), aff=d sub nom, Keck Mahin & Cate v.
Nat=l Union Fire Ins. Co. of
Pittsburgh, Pa.,
20 S.W.3d 692 (Tex. 2000).  On the record and the briefing before us, and in
deference to the trial court, we decline to address Wyeth=s alternative claims.  See Nat=l Union Fire Ins. Co. of
Pittsburgh, Pa.,
955 S.W.2d at 126 n.4.