Affirmed and Memorandum Opinion
filed December 7, 2010.

 

In
The

Fourteenth
Court of Appeals



NO. 14-09-00711-CV



Glynis Blaine,
Individually and as Representative of the Estate of Michael Blaine, Decendent
and as Guardian and Representative of Erica I. Blaine and National Fire of
Hartford, Appellants 

v.

National-Oilwell,
L.P., formerly known as National-Oilwell, Inc; National-Oilwell; and
National-Oilwell Varco, L.P., Appellees 



On Appeal from
the 190th District Court

Harris County, Texas

Trial Court
Cause No. 2008-62187A



 

MEMORANDUM OPINION

In this wrongful-death action, the trial court
granted summary judgment in favor of defendants/appellees National-Oilwell,
L.P. f/k/a National Oilwell, Inc., National-Oilwell, and National-Oilwell
Varco, L.P. (collectively “NOV”) against plaintiff/appellant Glynis Blaine,
individually, as representative of the estate of Michael Blaine, deceased, and
as guardian and representative of Erica Blaine (“Mrs. Blaine”) and intervenor/appellant
National Fire of Hartford.  The appellants challenge the trial court’s order granting
summary judgment in favor of the appellees on various grounds.  We affirm.

I

NOV provides products and services for the oil and
gas industry.  On October 17, 2006, NOV was in the process of manufacturing a
mobile oil and gas drilling and workover rig.  As part of the process, NOV hired
Stoehr Wire Rope of Texas to spool wire rope onto the rig’s sand drum.  Stoehr
sent its employee, branch manager Michael Blaine (“Blaine”), to perform this
task.

That same day, at about 11:00 a.m., the spooling of the
wire rope from Blaine’s truck to the rig began.  Neal Lee, an NOV employee, operated
the sand drum’s throttle to make the drum rotate which, in turn, spooled the
rope.  After the first layer and most of the second layer were complete, Blaine
complained that something might be wrong with the sand line and ordered that
the spooling operation stop.  After an NOV employee went to the top of the
derrick to confirm that the sand line was feeding properly from Blaine’s truck,
the spooling resumed.[1] 
Blaine subsequently leaned over and reached into the drum.  According to
uncontroverted testimony, the wire rope subsequently caught Blaine at the wrist
and pulled him into the drum, killing him.

On January 29, 2007, Mrs. Blaine filed suit against NOV
in Harris County alleging causes of action for negligence, gross negligence,
respondeat-superior liability, negligent entrustment, negligent hiring,
training, and retention, and premises liability.  On March 14, 2007, National
Fire intervened in the suit and asserted its subrogation rights as the insurer
of Blaine’s employer for its payment of medical and wage benefits to Mrs.
Blaine.  On May 14, 2007, NOV filed its answer and motion to transfer venue to
Gray County.  Mrs. Blaine opposed NOV’s motion to transfer, and the trial court
subsequently denied NOV’s motion.

On August 8, 2008, NOV moved for summary judgment on
all of Mrs. Blaine’s and National Fire’s claims.  The trial court heard the
motion on October 10 and granted it on October 13.  But between the hearing and
the court’s ruling, Mrs. Blaine filed a notice of nonsuit of her claims.

Days before the statute of limitations was set to
expire on her claims, Mrs. Blaine re-filed suit against NOV and others in Gray
County and Harris County.[2] 
On November 14, 2008, Mrs. Blaine served NOV with the petition in the Harris
County suit; on November 17, 2008, she nonsuited the Gray County suit.  In
January 2009, National Fire nonsuited its claims in the first Harris County
suit and then intervened in the second Harris County suit.  On January 22,
2009, NOV again moved for summary judgment on all of Mrs. Blaine’s and National
Fire’s claims.  On May 1, 2009, the trial court granted NOV’s motion.  The
court later severed the claims against NOV from those against the other
defendants.[3] 
This appeal followed.

II

Standard of Review

We
review summary judgments de novo.  Valence Operating Co. v. Dorsett, 164
S.W.3d 656, 661 (Tex. 2005).  NOV’s motion for summary judgment is a hybrid
traditional and no-evidence motion.  See Tex. R. Civ. P. 166a(c), (i). 
We therefore apply the established standards of review for each.  See Brockert
v. Wyeth Pharms., Inc., 287 S.W.3d 760, 764 (Tex. App.—Houston [14th Dist.]
2009, no pet.).

The
party moving for a traditional summary judgment bears the burden to show that
no genuine issue of material fact exists and that it is entitled to judgment as
a matter of law.  Joe v. Two Thirty Nine Joint Venture, 145 S.W.3d 150,
157 (Tex. 2004); Tex. R. Civ. P. 166a(c).  A genuine issue of material fact exists
if more than a scintilla of evidence establishing the existence of the
challenged element is produced.  Ford Motor Co. v. Ridgway, 135 S.W.3d
598, 600 (Tex. 2004).  A no-evidence summary judgment will be granted when (1)
there is a complete absence of evidence of a vital fact, (2) the court is
barred by rules of law or of evidence from giving weight to the only evidence
offered to prove a vital fact, (3) the evidence offered to prove a vital fact
is no more than a scintilla, or (4) the evidence conclusively establishes the
opposite of a vital fact.  King Ranch, Inc. v. Chapman, 118 S.W.3d 742,
751 (Tex. 2003).

            In
reviewing the granting of either type of summary-judgment motion, we indulge
every reasonable inference from the evidence in favor of the non-movant,
resolve any doubts arising from the evidence in its favor, and take as true all
evidence favorable to it.  Malcomson Rd. Util. Dist. v. Newsom, 171
S.W.3d 257, 263 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).  When a
summary judgment does not specify the grounds upon which the trial court ruled,
as here, we must affirm it if any of the summary-judgment grounds on which
judgment could be based is meritorious.  See Star-Telegram, Inc. v. Doe,
915 S.W.2d 471, 473 (Tex. 1995).

Analysis

In ten issues, Mrs. Blaine challenges the summary
judgment granted on her claims of (1) negligence, (2) respondeat-superior
liability, (3) negligent hiring, retention, and training, and (4) premises
liability.[4] 
In addition to adopting Mrs. Blaine’s issues, National Fire also argues on
appeal that the filing of Mrs. Blaine’s suit tolled limitations for its
intervention in the suit.[5]

A

Negligence
and Premises Liability

In issues five and seven, Mrs. Blaine and National
Fire (“the appellants”) contend that the trial court erred in granting summary
judgment on their negligence claims because there is more than a scintilla of
evidence and, at a minimum, a fact issue exists regarding whether (1) NOV owed
a duty to Blaine and (2) NOV’s negligence, or that of one of its employees,
caused Blaine’s death.  In issues nine and ten, the appellants assert that the
trial court erred in granting summary judgment on their premises-liability
claim because, at a minimum, a fact issue exists regarding whether (1) a pre-existing
defect existed before Blaine arrived on NOV’s premises and (2) the defect
caused Blaine’s death.

The appellants allege three factual bases for NOV’s tort
liability: (1) Lee was running the sand line too fast at the time of the
accident; (2) the guard gate NOV provided, which was only eighteen inches high,
should have been forty inches high; and (3) the floor plate on which Blaine was
standing at the time of the accident was not properly secured.  These acts or
omissions, the appellants claim, constitute negligence in NOV’s failure to take
various precautions to ensure the safety of Blaine’s work as well as a breach
of a duty to remedy a premises defect about which NOV knew or should have
known.  Therefore, we analyze the appellants’ negligence and premise-liability
claims together.

The three essential elements of a negligence cause of
action are (1) the existence of a legal duty, (2) a breach of that duty, and
(3) damages proximately caused by the breach.  See D. Houston, Inc. v. Love,
92 S.W.3d 450, 454 (Tex. 2002).  Premises liability is a special form of
negligence where the duty owed by a premises owner to a person entering on the
owner’s land depends upon the status of the person at the time the incident
occurred.  See Western Invests., Inc. v. Urena, 162 S.W.3d 547, 550–51
(Tex. 2005).  It is undisputed that Stoehr, Blaine’s employer, contracted with NOV
to spool wire rope onto the rig in question.

Under Texas law, the duties owed by premises owners
and general contractors to employees of independent contractors are generally
the same.  Shell Oil Co. v. Khan, 138 S.W.3d 288, 291 (Tex. 2004).  The
nature of that duty turns on whether the injury arose from activities or a
premises defect.  See id.  With respect to activities, a premises owner
who retains a right to control an independent contractor’s work may be liable
for negligence in the exercise of that control.  See id. at 292.  Premises
defects are divided into two categories: (1) those existing when an independent
contractor enters the premises and (2) those created by the independent
contractor’s work.  See Dow Chem. Co. v. Bright, 89 S.W.3d 602, 606
(Tex. 2002).  With respect to pre-existing defects, an owner has a duty to
inspect the premises and warn of defects the owner knows or should have known
about.  Clayton W. Williams, Jr., Inc. v. Olivo, 952 S.W.2d 523, 527
(Tex. 1997).  With respect to defects arising later, an owner has no duty
unless it retains a right to control the work that created the defect.  See Bright,
89 S.W.3d at 606.

Thus, negligence and premises liability involve
closely related yet distinct duty analyses.  Urena, 162 S.W.3d at 550. 
However, we need not examine these distinctions to resolve this case because
recovery under either cause of action is foreclosed in the absence of evidence
that NOV’s acts or omissions proximately caused Blaine’s death.

1.      No
Evidence of Causation

Proximate cause requires both cause in fact and
foreseeability.  See id. at 551.  “These elements cannot be established
by mere conjecture, guess, or speculation.”  Id. (quoting Doe v. Boys
Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 477 (Tex. 1995)).  The test
for cause in fact is whether the act or omission was a substantial factor in
causing the injury without which the harm would not have occurred.  Id. 
If the defendant’s negligence merely furnished a condition that made the
injuries possible, there can be no cause in fact.  See IHS Cedars Treatment
Ctr. of DeSoto, Tex., Inc. v. Mason, 143 S.W.3d 794, 799 (Tex. 2004).

The appellants contend that NOV owed Blaine a duty (1)
to control the speed at which the sand line drum was rotating; (2) to provide a
forty-inch guard gate; and (3) to properly secure the plate upon which Blaine
was standing.  They further argue that NOV breached each of these duties and
that these breaches caused Blaine’s death.  In support of their contentions, the
appellants rely on the testimony of expert witnesses Dewey Smith and John
Sexton.

Expert
testimony must provide an adequate factual basis for the expert’s conclusions. 
See City of San Antonio v. Pollock,
284 S.W.3d 809, 816 (Tex. 2009).[6]
 A conclusory opinion is one that does not provide the underlying facts to
support the conclusion.  CA Partners v. Spears, 274 S.W.3d 51, 63 (Tex.
App.—Houston [14th Dist.] 2008, pet. denied).  Conclusory statements in an
affidavit unsupported by facts are insufficient to defeat summary judgment.  Id. 
With these principles in mind, we examine the experts’ testimony below.

a.      Smith
Affidavit

In his affidavit, Smith stated, in relevant part, as
follows:

NOV installed a goat gate guard in front of the sand line
reel which was insufficient to protect Michael Blaine from falling into the
sand line drum.  NOV had made a conscious decision to lower the goat gate from
a 40 inch height to an 18 inch height at the time of this incident.  This
reduced height was too low to prevent Mr. Blaine from toppling over the guard
and into danger.  This was, in my opinion, a contributing factor to the cause
of this accident and Michael Blaine’s death.

NOV also had actual knowledge of the dangers and hazardous
condition of running the sand line drum at too fast of a pace.  In my opinion,
NOV failed to run the sand line drum at a slow enough speed as to not endanger
the life of Michael Blaine.  Neil [sic] Lee knew, as testified to by Nick Dyer,
that he had a tendency to run the sand line drum at too fast of a pace,
particularly while spooling the sand line.

NOV also knew through Neil [sic] Lee and Spencer Neff that
the drive shaft guard plate should have been properly bolted down and secured
to the floor.  This caused a hidden dangerous condition on the rig in that
Michael Blaine was forced to stand on this floor plate which was improperly
secured by only two bolts instead of four bolts to the floor at the time of the
accident.  This was, more likely than not, a contributing factor to Michael
Blaine’s falling into the sand line drum and his untimely death.

According to witness Spencer Neff, the drive shaft guard
floor plate was not properly bolted down or secured.  This situation created a
dangerous condition because Mr. Blaine was standing on the guard trying to
perform his work.  In addition, no one warned Mr. Blaine of the dangerous
condition or made him aware of the fact that the floor plate was not properly
bolted down.

Further, the goat gate guard also presented an [sic]
dangerous condition in the fact that the goat gate guard was approximately 18
inches high which was inadequate to protect employees from falling into the
rotating sand line . . . .  This goat gate was inadequate to protect Mr. Blaine
from being pulled into the sand line drum at the time of the incident which was
also a producing cause of Michael Blaine’s untimely death.

NOV, through their employee, Neil [sic] Lee, was operating and
rotating the sand line drum at a dangerous and excessive speed, considering the
circumstances. . . .  Mr. Adamson also stated that it was running pretty good
at least a quarter to one half throttle per Micah Adamson’s testimony in his
deposition on page 59.  In addition, Marland Miller testified that “if it was
going so fast that he could jerk him (Blaine) in and pull him under, the rig
was turned up too fast.”  (Miller Deposition pg. 232) 

I agree with Mr. Miller.  Based upon all evidence and my
education and experience in the field it is my opinion that the sand line drum
was being run too fast and thus caused Michael Blaine’s untimely death. 
Further, this is also based on the testimony of Nick Dyer who previously
provided an affidavit in this case.

. . . .

In my opinion, this accident could have been avoided had
NOV, the controlling employer, complied with industry standards, trained their
employees, and operated the rig at a safe speed.  The factors in conjunction or
individually were a proximate cause of the untimely death of Michael Blaine.

(i)               
Speed of Sand Line Drum

Smith’s
opinion that the speed of the sand line drum caused Blaine’s death is
conclusory and unsupported by the facts for several reasons.  First, although Smith
asserts that “NOV failed to run the sand line drum at a slow enough speed as to
not endanger the life of Michael Blaine,” he provides no evidence of the actual
speed of the sand line drum or the factors for determining what constitutes
a safe speed.  See, e.g., Texas Dep’t of Transp. v. Martinez,
2006 WL 1406571, at *7 (Tex. App.—San Antonio May 24, 2006, pet. denied) (mem.
op., not designated for publication) (concluding expert testimony
regarding allegedly unsafe degree of differing friction on road was mere
speculation absent supporting evidence of what ranges of friction were
dangerous or not dangerous).  In fact, the only evidence in the record regarding
the actual speed at which the drum was set at the time of the accident is Lee’s
testimony that the drum was in first gear, “just above idle.”  Further, Smith
provides no analysis as to whether a slower speed would have prevented or
lessened Blaine’s injuries.  See Goss v. Kellogg Brown & Root,
Inc., 232 S.W.3d 816, 819–20 (Tex. App.—Houston [14th Dist.] 2007 pet.
denied) (concluding expert opinion relating to tank safety system was no
evidence of causation because expert failed to establish whether alternative design
would have actually prevented injuries at issue); Price v. Ford,
104 S.W.3d 331, 333 (Tex. App.—Dallas 2003, pet. denied) (finding expert
testimony that failed to establish that earlier intervention by security guards
would have actually prevented some of injuries at issue was legally
insufficient to prove proximate cause).

Second,
the witness testimony upon which Smith bases his opinion regarding the
speed of the drum does not provide an adequate factual basis for the
opinion.   In his affidavit, Smith relies on the testimony
of NOV employees Micah Adamson and Marland Miller, and former Certex/Stoehr
employee Nick Dyer.  Smith asserts that the drum “was running pretty good
at least a quarter to one half throttle per Micah Adamson’s testimony in his
deposition on page 59.”  However, Mrs. Blaine omitted page fifty-nine from
the portion of Adamson’s deposition she included in the summary-judgment record,
and the portion of the deposition included in the record contains no such
statement.  

Smith
also relies on Miller’s testimony that “if it was going so fast that he
could jerk him [Blaine] in and pull him under, the rig was turned up too
fast.”  However, Miller was not present at the time of the accident
and is, therefore, not competent to testify as a fact witness regarding the
speed of the drum at the time of the accident.  See Tex. R. Evid. 602 (“A
witness may not testify to a matter unless evidence is introduced sufficient to
support a finding that the witness has personal knowledge of the matter.”). 
Moreover, Miller’s testimony—that if Blaine was pulled in, the drum must
have been going too fast—amounts to no more than conjecture.  See Bd.
of Trustees of Fire & Police Retiree Health Fund v. Towers, Perrin, Forster
& Crosby, Inc., 191 S.W.3d 185, 193 (Tex. App.—San Antonio 2005,
pet. denied) (“Rule 701’s requirement that the [lay witness’s] testimony be
based on the witness’s perception presumes the witness observed or experienced
the underlying facts, thus meeting the personal-knowledge requirement of [R]ule
602.”) (citations omitted).

Smith’s
opinion is also based upon the testimony of Nick Dyer, a former Certex/Stoehr
employee, who had assisted Blaine with spooling jobs for NOV on numerous
occasions before the accident.  In his affidavit, Dyer testified that
“Neil [sic] Lee, an employee of NOV[,] was known as an operator who operated
the rig at high speed and at times in a dangerous manner. . . .  Many
times I was instructed by my employer, Certex, to be very careful around Neil
[sic] Lee because he operated the rig including the sand line drum at high
speeds.”  Like Miller, Dyer was not present on the day in question
and has no knowledge as to the circumstances surrounding the accident. 
Thus, he is not competent to testify regarding the speed of the drum at the
time of the accident.  See Tex. R. Evid. 602; see also Bd. of
Trustees of Fire & Police Retiree Health Fund, 191 S.W.3d at 193.

(ii)            
Height of Guard Gate

Smith’s opinion also fails to provide an adequate factual
basis for his conclusion that the eighteen-inch guard gate caused or contributed
to Blaine’s accident.[7] 
Further, we find no evidence in the record that a forty-inch guard gate had any
probability of preventing the accident—this is especially significant in light
of the uncontroverted evidence that Blaine was pulled into the drum by the wire
line.  See Goss, 232
S.W.3d at 819–20; Price, 104
S.W.3d at 333.[8] 
The evidence also shows that when a forty-inch guard gate was used in the past,
Blaine removed it to do his work.  In the absence of any underlying facts to
support his opinion that the guard gate was a producing cause of the accident,
Smith’s statements are merely conclusory and insufficient to defeat summary
judgment.  See Spears, 274 S.W.3d at 63.

(iii)          
Floor Plate

Smith’s opinion likewise fails to provide any
underlying facts to support his conclusion that the allegedly unsecured floor
plate “was, more likely than not, a contributing factor to Michael Blaine’s
falling into the sand line drum and his untimely death.”  There is no evidence in
the record that the plate beneath Blaine’s feet moved or that Blaine otherwise
lost his balance and fell into the drum.  To the contrary, Adamson, who was
watching Blaine during the operation and could see his feet, testified that the
plate did not shift beneath Blaine’s feet nor did Blaine slip; rather, he was
caught at the wrist by the cable line.  Smith’s opinion fails to provide an
adequate factual basis to support his conclusion that the allegedly unsecured
floor plate contributed to Blaine’s accident and, thus, is insufficient to
defeat summary judgment.  See Spears, 274 S.W.3d at 63.

b.      Sexton
Affidavit

In his affidavit, Sexton states as follows:

Based on the background information and depositions
reviewed, the below-listed conditions, activities and/or worker knowledge
appear significant in evaluating the incident

. . . .

One NOV employee (Adolfo Ortego) [sic] stated that the
accident occurred because Mr. Neil [sic] was running the drum too fast.

. . . . 

The guardrail protecting workers on the rig from falling
into the sand drum had been reduced in size from the 40 inch height on previous
rigs to the 18 inch high goat gate used on the rig involved in this incident. 
The 18 inch height would not protect a worker in the area of the sand drum and
would likely be a tripping and/or falling hazard.

The plate covering the torque shaft on which Mr. Blaine
would have been standing while assisting in the spooling of the sand drum had
not been secured.  Apparently no one examined this plate following the incident
to determine its stability and evaluate the extent of the tripping hazard that
this equipment created.

. . . . 

Additionally, based on the items discussed in this report,
my evaluation of available material and my education, background and
experience, it is my opinion that the incident and the fatal injuries to Mr.
Blaine were the result of working in a hazardous environment.  NOV exercised
control over the equipment incorporated into the rig and the activities leading
to and including the spooling of the sand line.  These included the following:

. . . .

·        
NOV provided an 18 inch portable guard rather than the usual 40
inch high railing guard called for in industry standards and government
regulations.  The purpose of this guard was to protect workers from falling
into the sand drum area.

. . . .

·        
Although the NOV supervisor had been informed that the plate over
the torque shaft, which Mr. Blaine would have to step on, had not been
completely bolted down, no actions were taken to ensure that it was properly
secured.

In summary, this fatal accident would have been avoided had
NOV, the controlling employer, complied with accepted industry standards and
government regulations.  The actions and inactions by NOV which are listed
above singularly or together caused the injuries and death to Michael Blaine.

(i)               
Speed of Sand Line Drum

The only evidence Sexton
offers as a basis for his opinion that the speed of the drum caused the
accident is Adolfo Ortega’s purported statement that “the accident occurred
because Mr. Neil [sic] was running the drum too fast.”  However, this statement
appears nowhere in the summary-judgment record.[9] 
Further, as with Smith’s opinion, Sexton’s affidavit provides no evidence of
the actual speed of the sand line drum, the factors for determining what
constitutes a safe speed, see, e.g., Martinez, 2006 WL
1406571, at *7, or any analysis regarding whether a slower speed would have
prevented or lessened Blaine’s injuries, see Goss, 232 S.W.3d at 819–20.  Sexton’s opinion that the speed of the drum caused the
accident is not supported by any actual evidence.  See Houston Cab Co. v.
Fields, 249 S.W.3d 741, 749–50 (Tex. App.—Beaumont 2008, no pet.) (finding
expert opinion too conclusory where assumptions underlying expert’s opinion
were unsupported by actual evidence).

(ii)            
Height of Guard Gate

Sexton’s opinion also does not provide any underlying
facts to support his conclusion that the lower guard gate contributed to
Blaine’s accident.  See Fields, 249 S.W.3d at 749–50 (concluding where
assumptions underlying expert’s opinion vary materially from undisputed facts,
opinion is too conclusory to be given probative value).  Further, Sexton states
that the eighteen-inch guard gate was insufficient to protect a worker from
falling into the drum and would likely pose a tripping hazard.  However, there
is no evidence that Blaine fell into the drum or tripped over the guard gate;
rather, the uncontroverted evidence shows that Blaine was pulled into the drum when
he became caught at the wrist.  Moreover, Sexton offers no facts showing that a
forty-inch high gate had any probability of preventing the accident or lessening
Blaine’s injuries.  See Goss, 232
S.W.3d at 819–20; Price, 104
S.W.3d at 333.  As such, Sexton’s opinion is conclusory and is no evidence of
causation.

(iii)          
Floor Plate

Similarly, Sexton’s conclusion that the allegedly
unsecured floor plate contributed to Blaine’s accident is unsupported by any
underlying facts.  See Fields, 249 S.W.3d at 749–50.  Even assuming that
the platform was not properly secured, as the appellants allege, there is no
evidence that it caused or contributed to the accident, or that a properly secured
floor plate would have altered the outcome.  See Goss, 232 S.W.3d at 819–20; Price, 104 S.W.3d at 333.  Further, although
Sexton opines that no one examined the plate following the incident to
determine the extent to which it posed a tripping hazard, there is no evidence
suggesting that Blaine tripped on the plate.  Consequently, his opinion is
conclusory and insufficient to defeat summary judgment.  See Spears,
274 S.W.3d at 63.[10]

In summary, even assuming NOV owed Blaine a duty to
control the speed at which the sand line drum was rotating, provide a forty-inch
guard gate, and properly secure the floor plate upon which Blaine was standing,
and further assuming that NOV breached these duties, the appellants presented
no evidence that these acts or omissions were a substantial factor in causing the
tragic accident here.  See Urena, 162 S.W.3d at 551 (noting cause in
fact requires act or omission to be substantial factor in causing injury
without which harm would not have occurred).  We overrule issues five, seven,
nine, and ten.

B

Respondeat-Superior
Liability and Negligent Hiring, Training, and Retention

In issues six and eight, the appellants contend that
the trial court erred in granting summary judgment because there is more than a
scintilla of evidence and, at a minimum, a fact issue exists regarding whether (1)
an NOV employee was negligent, thereby giving rise to respondeat-superior
liability, and (2) NOV negligently hired, retained, or trained its employees.

Under the doctrine of respondeat superior, an
employer may be held vicariously liable when the negligence of its employee,
acting in the scope of his employment, is the proximate cause of another’s
injury.  See DeWitt v. Harris Co., 904 S.W.2d 650, 654 (Tex. 1995); CoTemp,
Inc. v. Houston West Corp., 222 S.W.3d 487, 492 n.4 (Tex. App.—Houston
[14th Dist.] 2007, no pet.).  To hold an employer liable for tortious actions
of its employees, a claimant must prove the following: (1) an agency
relationship existed between the employee (the tortfeasor) and the employer;
(2) the employee committed a tort; and (3) the tort was in the course and scope
of the employee’s authority.  See Zarzana v. Ashley, 218 S.W.3d 152, 159
(Tex. App.—Houston [14th Dist.] 2007, pet. struck).

By contrast, a claim of negligent hiring, training,
and retention is based on an employer’s direct negligence, rather than the
employer’s vicarious liability for the torts of its employees.  CoTemp,
222 S.W.3d at 492 n.4.  Under the tort of negligent hiring, training, and retention,
an employer who negligently hires an incompetent or unfit individual may be
directly liable to a third party whose injury was proximately caused by the
employee’s negligent or intentional act.  See id. at 492.  Thus, to maintain
claims of respondeat superior and negligent hiring, training, and retention, a
plaintiff must establish a negligent act or omission on the part of the
employee.  See id. at 492 & n.4.

Here, appellants assert that Lee “operated the rig in
a negligent manner” by running the sand line too fast.  They also contend that
Lee was negligent by failing to “inspect the premises where Mr. Blaine would be
working.”  In particular, they claim that Lee failed to determine whether the
guard gate was high enough and the floor plate was properly secured.  However,
as discussed above, there is no evidence that any of these alleged acts or
omissions proximately caused Blaine’s accident.  In the absence of any evidence
of causation, we conclude that the trial court did not err in granting summary
judgment on the appellants’ claims for respondeat superior and negligent
hiring, training, and retention.  We overrule issues six and eight.[11]

* * *

We affirm the judgment of the trial court.

 

                                                                                    

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

 

Panel consists of Justices Brown,
Sullivan, and Christopher (Sullivan, J., not participating).

 









[1]
The terms “wire rope,” “wire line,” and “sand line” are synonymous.





[2]
Mrs. Blaine added a cause of action for products liability in the second suit. 





[3]
Stoehr, Certex, USA, Inc., Wire Rope Corporation of America, Inc., and OEM
Fabricators, Inc., were also named as defendants in the suit.





[4]
Mrs. Blaine does not appeal the summary judgment granted on her claims of
negligent entrustment and products liability.





[5]
National Fire did not bring a claim for negligent hiring, retention, and
training and, therefore, cannot appeal from the summary judgment granted on
this cause of action.





[6]
NOV objected to the conclusory nature of Smith’s testimony in the trial court,
but the court granted its summary-judgment motion without ruling on its
objections.  Nevertheless, an objection that a statement is conclusory in
nature is an objection to a substantive defect and may be raised for the first
time on appeal.  See Pico v. Capriccio Italian Rest., Inc., 209 S.W.3d
902, 909 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (stating appellee’s
objections that witness statements were conclusory were objections to
substantive defects and, thus, appellee did not waive them by failing to obtain
ruling and could raise them on appeal).





[7]
We note that although Smith initially opines that Blaine fell into the sand
line drum, he later states that the guard gate was inadequate to protect Blaine
from being pulled into the drum.  The speculative nature of Smith’s
causation conclusion is underscored by his account of the events in which he
states, “At this point, the sand line drum began turning at a very fast rate
and Michael Blaine somehow became entangled in the wire cable in the
sand line drum and died” (emphasis added).





[8]
According to Lee and Adamson’s testimony, the wire rope caught Blaine at the
wrist and he was pulled into the drum.  The appellants, however, contend that
Blaine fell into the drum.  In support of their contention, the appellants cite
only to the factual background section of Mrs. Blaine’s response to NOV’s
summary-judgment motion.  The page cited in the response, however, does not
cite to any evidence.  Pleadings are ordinarily not considered competent
summary-judgment evidence.  See Laidlaw Waste Sys. (Dallas), Inc. v. City of
Wilmer, 904 S.W.2d 656, 660 (Tex. 1995).  Thus, the appellants’ reliance on
Mrs. Blaine’s summary-judgment response as evidence is misplaced.  





[9] We note that, in his deposition, Miller testified that
Ortega told him at one point that Lee “was running too fast.”  To the extent
that this is the statement to which Sexton refers in his affidavit, the
statement is not evidence of the cause of the accident; rather it is
only evidence of Ortega’s opinion regarding the speed of the drum.

 





[10] It is worth noting that both Smith and Sexton’s conclusions regarding causation are made in the
disjunctive.  Both experts recite a lengthy list of workplace conditions,
actions, or inactions and conclude that these factors “in conjunction or
individually” or “singularly or together” caused Blaine’s death.  Smith and
Sexton’s testimony identifying numerous potential causes of Blaine’s accident
without excluding any of them constitutes no evidence that these factors caused
the accident.  See Wal-Mart Stores, Inc. v. Merrell, 313 S.W.3d 837, 840
(Tex. 2010) (“An expert’s failure to explain or adequately disprove alternative
theories of causation makes his or her own theory speculative and
conclusory.”); see also Emmett Props., Inc. v. Halliburton Energy Svcs.,
Inc., 167 S.W.3d 365, 374 (Tex. App.—Houston [14th Dist.] 2005, pet. denied)
(finding expert’s opinion that discharge of hazardous chemicals on defendants’
property had caused contamination of plaintiffs’ properties to be mere
speculation where expert failed to rule out alternative sources for assumed
contamination); Martinez v. City of San Antonio, 40 S.W.3d 587, 595 (Tex.
App.—San Antonio 2001, pet. denied) (holding plaintiffs’ expert
testimony constituted no evidence defendant caused plaintiffs’ injuries because
expert failed to rule out
alternative sources of lead contamination in arriving at lead calculation); Hess v. McLean
Feedyard, Inc., 59 S.W.3d 679, 687 (Tex. App.—Amarillo 2000, pet.
denied) (“[A]n expert should
carefully consider and rule out alternative causes, and the failure to rule out
other causes results in speculation and conjecture and amounts to no evidence
of causation.”); Mitchell Energy
Corp. v. Bartlett, 958 S.W.2d 430, 448 (Tex. App.—Fort Worth 1997, pet.
denied) (“[The expert’s] failure to
rule out other causes of the presence of hydrogen sulfide in appellees’ water
renders his opinion ‘little more than speculation.’”) (citation omitted).





[11]
In issue one, the appellants challenge, in general, the trial court’s order
granting summary judgment on their claims.  In issues two, three, and four, the
appellants set forth several arguments as to why their claims are not barred by
the statute of limitations.  In its eleventh issue, National Fire contends that
the timely filing of suit by Mrs. Blaine, along with her due diligence in
serving NOV, preserved limitations for National Fire’s intervention in the
action.  However, we need not address these issues because they are unnecessary
to the final disposition of this appeal.  See Tex. R. App. P. 47.1
(requiring appellate court opinions to be as brief as practicable but to
address every issue raised and necessary to final disposition of appeal).